FILED
07/22/2024
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 9, 2024 Session

**JAMIE M. COOPER v. BRADLEY COOPER**

**Appeal from the Chancery Court for Henry County**
**No. 25212     Vicki Hodge Hoover, Chancellor**

_____

**No. W2023-00555-COA-R3-CV**

_____

In this divorce action, the trial court, inter alia, denied Husband any contact with the parties' children until he follows all recommendations from a complete psychiatric evaluation and granted Wife a lifetime restraining order. Husband now appeals. We affirm the trial court's decision to limit Husband's parenting time pursuant to Tennessee Code Annotated section 36-6-406. We vacate the lifetime restraining order and remand for the trial court to enter a more specific order pursuant to Tennessee Rule of Civil Procedure 65.02.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Vacated in Part; and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which ANDY D. BENNETT and ARNOLD B. GOLDIN, JJ., joined.

Paul Andrew Justice, III, Murfreesboro, Tennessee, for the appellant, Bradley Cooper.

Teresa McCaig Marshall, Paris, Tennessee, for the appellee, Jamie M. Cooper.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff/Appellee Jamie M. Cooper ("Wife") and Defendant/Appellant Bradley Cooper ("Husband") were married in June 2013. The parties have three children together: Kaylee, born in 2009; Kyle, born in 2010; and Kara, born in 2015.

The parties separated in May 2020. Wife filed a complaint for divorce in the Benton County Chancery Court[1] on October 26, 2020, alleging inappropriate marital conduct and

_____

[1] The matter was originally heard by Chancellor Hoover in the Benton County Chancery Court.

irreconcilable differences. Wife also requested that the trial court approve her proposed temporary parenting plan; award temporary and permanent spousal support, alimony in solido, and her attorney's fees; and issue an ex parte restraining order against Husband. An ex parte restraining order preventing Husband from contacting Wife in any manner was entered October 29, 2020, and stated that it would remain in effect pending further orders of the trial court.

Husband filed an answer and counter-complaint for divorce on December 14, 2020, also alleging inappropriate marital conduct and irreconcilable differences. Husband requested that the trial court approve his proposed temporary parenting plan; award temporary and permanent child support and his attorney's fees; and divest Wife of any rights to the parties' real and personal property.

A hearing was held December 14, 2020, after which the trial court provided the parties with its findings of fact and conclusions of law by letter filed December 22, 2020.[2] The trial court designated Wife as the children's primary residential parent, with Husband exercising parenting time for the entirety of every other weekend and the Sunday of the alternate weekends. The issue of child support was reserved, but Wife was awarded $1,000.00 per month in spousal support. Both the temporary parenting plan and the spousal support award were to run through March 2021.The restraining order was to continue for another ninety days, with the parties able to communicate only by text message and about the children.

Wife answered and moved to dismiss the counter-complaint in January 2021. Wife then filed a motion for contempt on January 29, 2021, alleging that Husband had been following her around town, and that Husband had potentially placed a tracking device on her vehicle and been in her house, all in violation of the restraining order against him.

On April 5, 2021, Wife filed a motion requesting that the trial court (1) require Husband to complete a psychological evaluation; (2) hold Husband in civil contempt for violating the restraining order; (3) establish Husband's child support obligation or extend the prior grant of spousal support; and (4) award Wife her attorney's fees. Wife also asked that the trial court modify the temporary parenting plan based on several allegations that Husband had violated the restraining order and was making co-parenting difficult. Wife alleged that Husband had continued to follow her around town, sent her flowers, and broken a window in her car and in her basement, and that Husband had been arrested for assaulting and stalking her friend.

---

The matter was later transferred to the Henry County Chancery Court, where it continued to be heard by Chancellor Hoover. For simplicity, we refer to the Chancery Courts only as "the trial court" throughout this Opinion.

[2] The letter was incorporated into an order filed February 8, 2021.

Husband also requested that the trial court order both parties and the children to submit to mental evaluations. He alleged that Wife had prevented him from exercising parenting time on three occasions and was making co-parenting difficult.

By order of July 9, 2021, the trial court ordered the parties to undergo custodial/forensic evaluations and to ensure the children were available for the evaluator to interview. The trial court also ordered that the restraining order remained in place, with the addition that Husband was prohibited from entering Henry County, Tennessee, or Murray, Kentucky for any reason other than for work or the children's activities.[3] Each parent was awarded one full week of parenting time with the children over the summer vacation, as well as the ability to speak with the children by phone for their birthdays. Husband was also awarded phone calls with the children twice a week. The trial court also directed Husband to reimburse Wife for the cost of her broken car window and stolen cameras,[4] as well as a portion of Wife's attorney's fees. Beginning May 1, 2021, Husband was ordered to pay Wife $1,500.00 per month in child support, with a credit of $1,000.00 per month for any spousal support previously paid as ordered. Any issues of contempt and the remainder of Wife's attorney's fees were reserved.

Wife filed a petition for an order of protection against Husband in the Henry County General Sessions Court ("the general sessions court") on July 12, 2021. Therein, Wife alleged that Husband's stalking and harassment was escalating, with Husband being seen around her house, church, and other locations. A temporary order of protection was issued that day. Pursuant to a July 21, 2021 order, the general sessions court extended the temporary order of protection pending future orders. The general sessions court also ordered Husband to transfer all firearms in his possession to other persons legally allowed to have them, and to only enter Henry County to access a specific highway for work travel. The order transferred the matter to the trial court, where all other issues associated with the divorce and children would be resolved.

On September 7, 2021, Wife moved to suspend Husband's parenting time and to sell the marital home, and for a restraining order and contempt. Wife alleged that Husband was continuing to stalk and harass her and the children, going so far as to put bleach in her car's gas tank, potentially placing and then removing a tracker on Wife's vehicle, and having a private investigator place a tracker on the vehicle of Wife's boyfriend and cameras around Wife's home. She stated that Husband had three active warrants in Henry County for violating the order of protection. Wife requested that the children be placed in her sole custody and alternative arrangements be made for the custodial evaluation. Wife further alleged that Husband was $5,200.00 in arrears on his child support obligation and had not

---

[3] At this time, Wife lived in Henry County, Tennessee, and worked in Murray, Kentucky, while Husband lived in Benton County, Tennessee.

[4] This payment was specifically recognized to not be considered an admission of wrongdoing by Husband.

reimbursed her for the broken window, missing security cameras, or attorney's fees as previously ordered. Wife requested an additional portion of her attorney's fees. Wife also requested to take possession of and sell the marital home, to be able to pay the delinquent mortgage.

The trial court granted the restraining order the same day, noting that it was the third application for a restraining order in the case. The order directed that Husband was "restrained and prohibited from interfering with [Wife's] care, custody, and control of the parties' minor children . . . or coming around or about [Wife] or the children in any form or fashion." The restraining order was extended in September 2021, after a hearing at which Husband failed to appear,[5] and by order of January 31, 2022, the trial court directed that the restraining order and the July 2021 temporary order of protection would remain in full force and effect, with the exception of court appearances only.

The matter was eventually heard in February 2023. Only the parties testified. Wife primarily relayed Husband's behavior after she filed for divorce. Wife testified that she found tracking devices on her vehicle in January and April 2021. Wife testified that she saw Husband following her, near her residence, or near her workplace in January, March, and August 2021. Wife further provided photos of Husband outside her home late at night in February 2021 and multiple videos of Husband driving around her neighborhood in March 2021. Wife testified that Husband was arrested for stalking and assaulting a male friend of Wife's in Benton County in March 2021. Additionally, flowers were sent to Wife at work in March 2021, with a card stating "God loves you. -KC"[6] and Wife testified that she saw Husband near her work the same day.

Wife testified that after visiting with Husband prior to April 2021, the children "would come home upset and crying" and ask "if they could not go back over there . . . because they didn't like seeing their daddy act the way he was acting." She explained that Husband "continued to talk to the kids about how God hates divorce and how this was [Wife's] fault and it's [Wife's] fault that the family is torn apart." Wife further testified that in "the vast majority" of the visits Husband had with the children, "he would call [her] wanting [her] to come pick them up. He didn't ever keep them for very long. He might have had them for three or four hours each visit before he would call [Wife] to come pick them up."

Wife testified that in April 2021, Husband was waiting outside her friend's home in his car with the children, and stated to the children: "Look at your mom being a whore." In

---

[5] At this hearing, Husband's attorney explained that Husband was working out of state at the time. Wife's attorney posited that Husband was actually attempting to avoid the service of multiple outstanding criminal warrants.

[6] Wife testified that the only connection she could make to the "KC" signature was that all of her children shared those initials. However, Wife did not have any indication that the flowers were actually from her children.

July 2021, Wife's keys went missing and her car was rifled through; Husband was spotted nearby and avoided the police's attempt to confront him. Husband later returned Wife's keys. Wife also provided pictures and a video of Husband parked near her church in July 2021. She testified that she was there to collect a child support payment Husband said that he left in the church, but that no payment was left.

Husband was charged with aggravated stalking and two violations of the order of protection in Henry County in August 2021. The accompanying affidavits explained that Husband had contacted Wife on multiple occasions and had intentionally made contact with Wife at the soccer game of the parties' son. This incident occurred the same night bleach was found in Wife's car's gas tank. The affidavit further stated that "[Wife] is in fear of [Husband] and what action he might [take] against her if this continues." Husband pleaded guilty to stalking in November 2021, but was placed on judicial diversion. Husband was sentenced to eleven months and twenty-nine days of supervised probation and ordered to complete an anger management course and have no contact with Wife.[7]

Wife provided recordings of voicemails Husband left on her cell phone at some time after the July 2021 order of protection was in place but prior to September 2021. In the first recording, Husband states:

> All these gosh-damn motherf***ing whores out here are so gosh-damned selfish. They can't motherf***ing gosh-damn think about their kids. It's why the world's in this shape it is, is 'cause of f***ing gosh-damn selfish f***ing whores.

In a series of recordings, apparently directed toward Wife's boyfriend, Husband states:

> And piece of shit n*****s. Gaw, I wish he'd -- I wish his -- I can't wait until he has to reap the f***ing gosh-damn seeds that he's sowed.

> Bitch boy, every time you see me you're going to have to hold your f***ing head down like you do every gosh-damn time, you weak little motherf***er.

> And you just remember that, you f***ing [Wife's boyfriend's name] piece of shit. I see your kid, I'll whoop his f***ing ass, too.[8]

> I'll f***ing gloat in your goddamn face every time I pick up my kids, you little bitch.

---

[7] Given the proof concerning Husband's later contact with Wife during the year that followed his guilty plea, it is unclear from the record whether this conviction was ever successfully diverted.
[8] The son of Wife's boyfriend was eleven years old at the time of trial.

Wife also had video recordings of Husband driving near her home in December 2021.

Between December 2021 and August 2022, though, things were relatively "quiet" and "peaceful." Wife explained that this was due, in part, to the counseling she and Husband were attending with the psychologist named by the trial court to conduct the forensic evaluations.[9] Wife testified that she reached out to Husband in July 2022 to attempt to form a parenting plan outside of the court system so as to "be civil for the kids' sake." She brought the children to the marital home where Husband was living and left the children in his care for a few hours "to give him quality time with the kids." A few weeks later, Husband and his girlfriend invited Wife and the children over for a cookout; Wife stayed for a few hours and the children spent the night. Wife testified that the children were upset upon coming home in the morning and did not return to Husband's home after that visit. However, Husband was hospitalized for an illness in August 2022 and Wife brought the children to see him then for about an hour. At another point in August 2022, the parties took the children shopping and Husband purchased approximately $500.00 worth of clothing for the children. Wife explained that the children also had a few phone calls with Husband during this period, but that the calls "stopped when the kids made the decision that they didn't want to talk to him."

In July 2022, while Wife "was trying to be civil with him[,]" Husband sent Wife pictures of himself shirtless and of his erect penis by Facebook Messenger, along with a message that "I want to f my wife. And I would l[o]ve to tell you about somethings." Wife testified that, during one of the times when she brought the children over to visit with Husband, he "called [her] into the bedroom" where he was naked and had sex toys on the bed, and "tried to get [her] to have sex with him."[10]

Wife testified that she lost her job based on phone calls from Husband to her boss and her boss's daughter. She and the children then relocated to move closer to a new job in August 2022. Wife testified that she was almost fired from that job as well, as a result of Husband calling and sending flowers to her workplace.

In October 2022, the vehicle of Wife's boyfriend had "bitch" spray painted across the side, its tire flattened, and its windshield smashed while parked in Wife's driveway. Wife's home air conditioner unit was damaged at the same time the vehicle was vandalized.

Wife presented a series of video recordings sent by Husband to the children in October 2022. In one, Husband says, in part:

> Nobody else has got the right to play daddy to you, or mama, ever, because
> you don't got one. That stepdad bullshit, blended horse-malarkey, that's bull

---

[9] This counseling was discontinued in October 2022, pursuant to an order of the trial court. No report from the evaluator was ever produced.

[10] Wife denied being physically intimate with Husband after they separated.

crap. The best that somebody else could be is a role model to you guys. I'm your dad. I deserve to know your grades, your sickness, what's going on, whether you're going to convention or not, and I deserve to have a say-so in it. And I haven't had that. That's what I'm saying. And I hate it that you guys are stuck in -- [video cuts off].

In a video sent in a group message to both Wife and the children, Husband appears to be driving while speaking into the camera, stating:

See [Wife], the way I've got it figured, you used money for the kids, my money, to give [your boyfriend], the bum; so I'm going to meet you at the park because nobody's at the park at nine o'clock at night. And right is right and wrong is wrong. Our kids are very smart and they need us both. That's just the truth of it. And, you know, you talk about reconciliation and counseling but they ain't one hide, hair of it. The only thing -- The only one who's even put in any effort is me, and I'm still sitting here without seeing my babies, without getting to talk to them at night. Because y'all my babies. [Wife] is my wife. And we shouldn't've never done any of this, but it's where we're at. And I love you guys and I pray God hold his hand over you.

Wife also provided recordings of voicemails left on her cell phone by Husband in October 2022. In one recording, Husband states, in part:

You are simply not going to sit and say -- I mean, I'm going to pay your gosh-damn f***ing lawyer. I gotta pay the f***ing c*nt whore anyhow. F***ing shit, I mean why should I pay you, so you can go on more f***ing vacations with [your boyfriend]? F*** you, bitch. Hell f***ing no. No. I'll pay the gosh-damn c*nt whore over there. And f***ing gosh-damn, she better pray I never meet her children.

In another, Husband yells:

Every goddamn woman of this age. It's a spirit. Loves theirself more than their children. They'll break their home. They'll destroy their father. They'll goddamn love theirself and be selfish before they'll ever lay down theirself, like they're supposed to. It's a spirit. You're part of it. Them goddamn women on the bench and in that court system are part of it, and f***ing [Husband's girlfriend] is part of it. It's how Satan won the world.

Husband's girlfriend provided Wife with a recording of a conversation she had with Husband around this same time. Therein, Husband says: "You tell that bitch that I'm on my way and I'm going to goddamn kill her or she's going to f***ing gosh-damn get right

and do everything [indiscernible].[11]

Husband was later charged with stalking in Rutherford County on October 30, 2022. The included affidavit indicated that Husband had called Wife numerous times and shown up at her church, and that he had followed Wife's boyfriend and brandished a gun at him. Wife also sought and received a temporary order of protection in the Rutherford County Chancery Court.

Husband was then charged with aggravated stalking and evading arrest in Williamson County on November 1, 2022, after showing up at a restaurant where Wife was eating in her vehicle. Wife testified that Husband opened her car door and said that "if [she] did not let him see the kids he was going to kill [her]." The affidavit included in the arrest warrant stated that the officer "observed [Wife] to be visibly shaking from the incident."[12]

Wife testified that Husband had not reimbursed her for the broken window or missing security cameras or paid her attorney's fees as ordered by the trial court. At the time of trial, Wife's total attorney's fees balance was $43,456.75.

Wife further testified that she had continuous problems collecting child support from Husband. Wife explained that Husband had sent her attorney two checks for $1,500.00 each in September 2022, marked for January and February 2022 child support. However, based on Husband not fully filling out the checks, Wife was unable to cash them to receive the payments. Wife testified that, in all, Husband had paid a total of $10,450.00 in support. Thus, Husband still owed $33,050.00 in child support at the time of trial.[13] Wife testified that she and the children left the marital residence in May 2020 with "nothing but an air mattress to sleep on." Yet, she explained, "not one time did [Husband] call [her] and offer to help without wanting sex and showing dirty pictures or stalking and harassing [her] or anything." Husband's banking records indicated that Husband received over $150,000.00 in employment income between September 2021 and October 2022.[14]

Wife testified that she was requesting that she be named the children's primary

---

[11] Wife conceded that Husband had not physically assaulted her or the children from 2021 through 2023.

[12] In all, Wife provided records of the following charges brought against Husband: (1) assault and stalking of Wife's friend in Benton County in March 2021; (2) aggravated stalking of Wife and two violations of the order of protection in Henry County in August 2021; (3) stalking of Wife in Rutherford County in October 2022; and (4) aggravated stalking of Wife and evading arrest in Williamson County in November 2022. Husband pleaded guilty to the Henry County charges, but Wife did not know the outcome of the other charges, as some remained pending at the time of trial.

[13] Child support was set retroactively at $1,000.00 per month from May 2020 through April 2021, and then $1,500.00 per month from May 2021 through January 2023, for a total amount of $43,500.00.

[14] Husband testified to "hav[ing] the capabilities of making large amounts of money" and having recently taken "a steady job that pays $42.00 an hour."

residential parent. She explained that Husband had been a good father to the children during the marriage, but that the children have been upset and hurt by Husband's more recent behavior, which had only gotten worse since the parties had separated despite her attempts to be civil. Thus, her proposed parenting plan was in the children's best interests. In response to cross-examination, Wife explained that "it would depend on what kind of counseling [Husband's] getting[,]" but she would "be okay with supervised visits."[15] Wife also requested that the restraining order remain in full force and effect.

Husband did not dispute that the recordings played at trial were of him, or that his words were "not appropriate." Husband explained that he was in "a very distraught and emotional moment" and that his "father didn't teach [him] how to deal with emotions, but [he is] learning to deal with them." He stated that he attended anger management and parenting classes and that he would "do what it takes to see [his] children and for them to see their dad in a different demeanor than a broken, distraught state[.]" Husband testified that, early on after the parties separated, he "wasn't easy to work with, but [he] was trying to do the best for [Wife] and for the kids. But [he] was very hurt and [he] was very distraught and very emotional. [He] did not want the divorce. [He] didn't want [his] kids to go through the trauma."

Husband testified that he was caught up on child support at the end of 2021, and then he sent the $3,000.00 to Wife's attorney in September 2022. Then in October 2022, he "gave [Wife] every dollar [he] had[,]" for child support "along with buying groceries, paying her electric[,]" for a total of around $2,500.00. As to why he had not paid child support for January 2023, Husband stated that he "didn't know where to send the money to[,]" before admitting that he had already sent previous support payments to the office of Wife's attorney.

Husband testified that Wife had begun a conversation about reconciliation and counseling in June 2022, leading Husband to break up with his girlfriend. Husband also testified that he believed that "this whole divorce proceeding was put on the shelf" in September or October 2022.

When asked to confirm whether he had threatened to kill Wife twice after September 2022, Husband would only admit that he "had some emotional moments." Husband was similarly evasive throughout his testimony. Husband testified that he did not recall being around Wife's car in January 2021. When asked whether he broke the window of Wife's car or stole Wife's security cameras, Husband invoked his Fifth Amendment rights. Husband testified that he did not recall if he was around Wife's home and denied putting bleach in the gas tank of Wife's car, but admitted to seeing Wife at the parties' son's soccer

---

[15] On re-direct examination, Wife agreed that there was no supervisor who could "stop the videos we've seen today[,]" or who could "stop the cussings that we've seen today -- all in the presence of [her] children."

game in August 2021. Husband also admitted to sending Wife flowers.

Husband testified that he began taking testosterone replacement therapy shots in June 2021, that his "levels were off the chart[,]" and that part of the reaction to his hormone level "is obsessive compulsive behavior along with emotional outbreaks." He stated that his anger, and the devolution of his behavior, after the separation was the result of the dissolution of the marriage and unfaithfulness by Wife.[16] Husband also testified that he now believed that the dissolution of the marriage "will alleviate very much of [his] feelings, emotions, and spiritual ties."

The trial court first issued an order on February 16, 2023 dealing with the agreed sale of the marital home.[17] The trial court then provided the parties with its findings of fact and conclusions of law regarding the remaining issues by letter of February 21, 2023.[18] In its findings, the trial court noted that:

> [Husband] presented himself as literate and anxious to testify. [Husband's] testimony was such that he evaded answering questions but instead wanted to "present" his own story. I found [Husband] not to be credible. After several self-serving answers, the Court admonished [Husband] "to answer the questions that were posed to him." [Husband] bemoans the fact that his life has become difficult. . . . [Husband] has little to no understanding that he is the author of his own misfortune and that if he had followed the law, at least some of his problems would not exist.

Ultimately, the trial court granted Wife a divorce on the ground of inappropriate marital conduct and denied Husband's counter-claim. The trial court granted Wife's proposed valuation and division of the marital property. As alimony in solido, the parties were directed to share equally in Wife's student loan debt, and Wife was awarded her attorney's fees. Husband's past-due child support and Wife's attorney's fees would be paid from Husband's one-half portion of his retirement account.

The trial court named Wife the primary residential parent of the children, approving Wife's proposed permanent parenting plan wherein Husband was granted zero days with the children. The trial court directed that Husband would not have any visitation or contact with the children until he "employ[ed] a licensed psychiatrist and obtain[ed] a complete evaluation from said psychiatrist." And once Husband "followed a plan of the psychiatrist successfully, those results may be furnished to the Court and [Husband] may move the

---

[16] Husband admitted that he did "believe that there's a spirit of Jezebel that's rampant loose[.]"

[17] Neither party has raised the valuation or division of property, including the sale of the marital home, as an issue in this appeal, so we do not tax the length of this Opinion with more discussion of the home or property than necessary.

[18] The letter was incorporated into a final judgment entered March 16, 2023. An amended judgment was entered later the same day, relating only to the sale of the marital residence.

Court for a hearing to determine any future contact with the children." The trial court specifically laid out its rationale:

> The Court's primary purpose in making any Ruling is the safety of the children. The Court opines that if Defendant is capable of making threats to the safety of another person's children, then he is also capable of harm to his own children. With the evidence presented to me on the date of trial, the Court feels there is no alternative but to do everything possible to ensure the children's safety. Also of concern is the fact that the parties have female children, and [Husband] has made known his feelings, biblical or otherwise, regarding the Judas[19] aspect he believes follows all females.

The trial court further explained that "[i]n addition to the cases cited, the Court has considered T.C.A. Sect. 36-6-406, Restrictions in Temporary or Permanent Parenting Plans; [and] T.C.A. Sect. 36-6-106 Determination in child custody . . . . The pleadings in this case, the Exhibits, and the testimony of the parties have precluded some of the determinative factors." The trial court stated that it did "not feel that supervised parenting time is appropriate because [Husband] cannot be around [Wife]. And I would be exposing any potential 'supervisor' to possible danger, given [Husband's] volatile personality. With this Ruling, [Husband] is given the keys to rehabilitation, such that future parental involvement could be possible."

Husband was directed to pay child support consistent with the child support worksheet presented by Wife, which was created without the benefit of proof of Husband's income. The trial court stated that if Husband provided sufficient proof of his income, he could petition for the calculation of a variance.

Finally, the trial court found Husband guilty of contempt,[20] but ruled that it would "defer any sentence, in view of his court dates in other venues and conditioned upon his following the mandates in this Order, incurring no further violations of the Restraining Order, or interfering with Wife's peaceful well-being, and [Husband's] staying gainfully employed."[21] Wife was also "awarded a lifetime Restraining Order against Husband."

---

[19] As noted in his brief, Husband did not reference Judas during his testimony. Instead, he referred to "a spirit of Jezebel that's rampant loose[.]"

[20] The trial court noted in its findings that:

Hearing the hatred spilling from [Husband's] mouth in listening to the tapes was horrifying to observe and indicates to the Court that he needs professional help. For a supposedly "religious" man, [Husband] used the word, "God-damn" more than once, and is in direct contravention to his supposed religious beliefs. Be that as it may, the other tapes showed (visual) [Husband] in close proximity of [Wife], after he was ordered to not be around [Wife], or in Henry County except for travel to work or later, only for court appearances.

[21] Generally, "appellate courts have jurisdiction over final judgments only." **Bayberry Assocs. v. Jones**, 783 S.W.2d 553, 559 (Tenn. 1990). However, "a contempt proceeding is sui generis and is

Husband filed a timely appeal.

## II. ISSUES PRESENTED

Husband raises the following issues on appeal, taken directly from his brief:

> 1. Instead of addressing the statutory factors for child custody, the judge denied custody and visitation on other grounds. Namely, the judge denied custody because Husband (1) insulted the judge in a recorded phone call to Wife, (2) made comments with religious overtones about today's women being selfish, and (3) suggested that he might hurt the family of Wife's attorney if he ever met them. Regardless of what we may think of Husband's speech and his religious views, did the trial court abuse its discretion by relying on the wrong factors?
>
> 2. Did the trial court err by imposing a "lifetime restraining order" where none was sought, where Wife by her own admission had repeatedly contacted Husband, and where none of the requirements of Tenn. Code Ann. § 36-3-627 were satisfied?

In the posture of appellee, Wife requests her appellate attorney's fees.

## III. STANDARD OF REVIEW

"We review the judgment of a trial court in a bench trial de novo upon the record, according a presumption of correctness to the factual findings of the court below." *Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 527 (Tenn. Ct. App. 2011) (citing Tenn. R. App. P. 13(d)). We review the trial court's legal conclusions de novo with no presumption of correctness. *Burress v. Shelby Cnty.*, 74 S.W.3d 844, 846 (Tenn. Ct. App. 2001).

Additionally, our supreme court "has previously emphasized the *limited* scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments." *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017) (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 692–93 (Tenn. 2013)). In applying the de novo standard, "we are mindful that '[t]rial courts are vested with wide discretion in matters of child custody' and that 'the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion.'" *Johnson v. Johnson*, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004) (quoting *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993)). An abuse of discretion in

considered incidental to the case out of which it arises," *Doe v. Bd. of Prof'l Resp. of Sup. Ct. of Tenn.*, 104 S.W.3d 465, 474 (Tenn. 2003), such that an "unresolved contempt petition does not serve as a barrier to finality." *Est. of Bentley v. Byrd*, 556 S.W.3d 211, 216 n.8 (Tenn. Ct. App. 2018).

child custody cases occurs when the trial court's decision "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Armbrister*, 414 S.W.3d at 693. "The paramount concern in establishing a permanent parenting plan is the best interest of the children." *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013).

## IV. ANALYSIS

## A. Child Custody

The first issue before us concerns the permanent parenting plan approved by the trial court, in which Husband is prohibited from contacting the children until he follows the recommendations of a psychiatric evaluation. Husband's initial argument is that the trial court judge erred in considering "the insulting language against her [i.e., the trial court judge]," Husband's religious views, and "Husband's offhand comment about potentially harming Wife's attorney's family"[22] while forming the permanent parenting plan. He asserts that these considerations infringe on his First Amendment right to make offensive comments, use violent hyperbole, and follow a religious doctrine. Husband also asserts that the trial court judge should have recused herself sua sponte rather than express "open bias" against him in her judgment, in violation of his Due Process rights.

Following our thorough review of the record, however, there is no indication that Husband ever raised an argument to the trial court that it was not permitted to consider his inappropriate comments as a basis for its child custody decision.[23] *But c.f.* ***Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.***, 457 U.S. 596, 607 (1982) (holding that "safeguarding the physical and psychological wellbeing of a minor" can be a compelling interest sufficient to justify a narrowly tailored restriction on speech). Here, Wife presented extensive testimony about Husband's prior offensive statements. Thus, Husband was clearly on notice that Wife intended that Husband's statements would be considered for purposes of the custody determination. But no arguments concerning the First Amendment or the freedom of speech were raised during trial, before the trial court provided its written findings of fact and conclusions of law, in the month before these findings and conclusions were incorporated into a written order, or in a motion to alter or amend after the judgment

---

[22] In his brief, Husband clarifies that "he did not say that he was going to hurt [Wife's attorney's children], just that he *might* if he ever encountered them."

[23] To the extent that Husband suggests that it was his speech alone that the trial court considered in restricting his visitation, we must respectfully disagree. Here, while Husband's speech was certainly at issue, there was also extensive testimony about his harassing and threating conduct. *Cf. Purifoy v. Mafa*, 556 S.W.3d 170, 191–92 (Tenn. Ct. App. 2017) ("[F]ree speech does not include the right to cause substantial emotional distress by harassment or intimidation." (quoting ***State v. Cooney***, 271 Mont. 42, 894 P.2d 303, 307 (Mont. 1995))); *see also* ***McNally v. Bredemann***, 391 Ill. Dec. 287, 30 N.E.3d 557, 563 (Ill. 2015) ("While stalking does contain an element of speech, that speech does not fall within the protections of the first amendment.").

was filed.[24] Husband, therefore, cannot assert error in these considerations on appeal. *See Powell v. Cmty. Health Sys., Inc.*, 312 S.W.3d 496, 511 (Tenn. 2010) ("It is axiomatic that parties will not be permitted to raise issues on appeal that they did not first raise in the trial court."); *see also Carroll v. Morgan Cnty. Bd. of Educ.*, No. E2017-00038-COA-R3-CV, 2017 WL 5712903, at *3 (Tenn. Ct. App. Nov. 28, 2017) ("Because plaintiff waived and abandoned her free speech claim in the trial court, she cannot raise it now on appeal.").

Waiver also applies to Husband's argument that the trial court judge should have recused herself sua sponte. Recusal is generally governed by Rule 10B of the Rules of the Tennessee Supreme Court. Rule 10B provides that "[a]ny party seeking disqualification, recusal, or a determination of constitutional or statutory incompetence of a judge of a court of record, or a judge acting as a court of record, shall do so by a written motion filed promptly after a party learns or reasonably should have learned of the facts establishing the basis for recusal." Tenn. Sup. Ct. R. 10B, § 1.01. "In some circumstances, however, judges have an obligation to recuse themselves even if litigants do not file recusal motions." *Cook v. State*, 606 S.W.3d 247, 254 (Tenn. 2020) (citing Tenn. Sup. Ct. R. 10, R.J.C. 2.11(A) & cmt. 2 (outlining a non-exclusive list of six circumstances in which a judge should recuse)). Although not specifically cited, it appears that Husband asserts that recusal is required under section 2.11(A)(1) because the trial court judge had an "open bias" against him.

But Husband's argument fails for a number of reasons. First, in addition to not raising this question to the trial court, Husband also did not properly raise this issue on appeal. Specifically, while Husband argues for recusal in the argument section of his appellate brief, he did not designate this argument as an issue on appeal. "We consider an issue waived where it is argued in the brief but not designated as an issue." *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002). Moreover, Husband has not asserted that the trial court judge's alleged bias stems from any extrajudicial source. Indeed, to merit recusal, bias must generally "be of a personal character, directed at the litigant, must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from . . . participation in the case." *Elseroad v. Cook*, 553 S.W.3d 460, 466 (Tenn. Ct. App. 2018) (internal quotation marks omitted) (quoting *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994)). "If the bias is alleged to stem from events occur[r]ing in the course of the litigation of the case, the party seeking recusal has a greater burden to show bias that would require recusal, i.e., that the bias is so pervasive that it is sufficient to deny the litigant a fair trial." *Boren v. Hill Boren, PC*, 557 S.W.3d 542, 552 (Tenn. Ct. App. 2017) (quoting *Runyon v. Runyon*, No. W2013-02651-COA-T10B-CV, 2014 WL 1285729, at *6 (Tenn. Ct. App. Mar. 31, 2014)). Here, Husband has neither alleged nor demonstrated that the trial judge's alleged bias was so pervasive as to deny him a fair trial. As such, we conclude that the trial court did not err in failing to sua sponte recuse from this matter.

---

[24] We note that Husband's attorney on appeal did not represent Husband in the trial court.

Husband next argues that the trial court "simply failed to address the factors that actually matter." As part of this argument, Husband appears to assert that the trial court failed to apply *any* statutory factors. Husband then asserts that applying the correct factors under Tennessee Code Annotated section 36-6-106 to the facts of this case, he should have been granted considerably more visitation than allotted by the trial court. Respectfully, we do not agree that the trial court "veered off course from the statute" that is applicable in this case.

It is true that in a typical child custody matter, custody and visitation are guided by section 36-6-106(a)'s best interest factors. *See* Tenn. Code Ann. § 36-6-106(a) (stating that when a court makes a custody determination regarding a minor child, the determination shall be made on the basis of the child's best interest and outlining fifteen non-exclusive factors to be used in this determination).[25] Even when the section 36-6-106 best interest factors are applicable, however, "there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination[.]" *In re Connor S.L.*, No. W2012-00587-COA-R3-JV, 2012 WL 5462839, at *4 (Tenn. Ct. App. Nov. 8, 2012) (quoting *Murray v. Murray*, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept. 28, 2010)).

Yet, section 36-6-106's best interest factors are not implicated in every child custody matter. Specifically, Tennessee Code Annotated section 36-6-404(b) provides that "[i]f the limitations of § 36-6-406 are not dispositive of the child's residential schedule, the court shall consider the factors found in § 36-6-106(a)(1)–(15)." Provisions within Tennessee Code Annotated section 36-6-406 require or permit a trial court to restrict the residential time of a parent based on parental misconduct or the presence of certain limiting factors. *See* Tenn. Code Ann. § 36-6-406(a) (requiring limitation based on parental conduct), (b) (requiring limitation based on conduct by a person residing with the parent), (c) (requiring limitation based the parent or a person residing with the parent being convicted of certain offenses), (d) (permitting limitation based on the existence of limiting factors). Thus, if limitations under section 36-6-406 related to these issues are sufficient to decide the issue of custody and visitation, then the trial court is not required to consider section 36-6-106's best interest factors in any manner.

We agree that the trial court's order is sparse as to its legal basis. But our review of the order reveals that the trial court indeed applied section 36-6-406: the trial court explicitly stated that it "considered T.C.A. Sect. 36-6-406, Restrictions in Temporary or Permanent Parenting Plans; [and] T.C.A. Sect. 36-6-106 Determination in child custody[.]" While the best practice would have been for the trial court to more explicitly explain that it was restricting Husband's visitation under a specific provision or provisions of section 36-6-406, we conclude that the trial court's order as a whole, coupled with the transcript

---

[25] In this Opinion, we refer to the versions of all relevant statutes in effect at the time Wife's complaint for divorce was filed in October 2020.

of the divorce hearing, is sufficiently detailed so as to establish that the trial court was applying section 36-6-406 in this matter.[26] *See Mabie v. Mabie*, No. W2015-01699-COA-R3-CV, 2017 WL 77105, at *3 (Tenn. Ct. App. Jan. 9, 2017) ("[B]ecause the trial court's reasoning is evident to some extent from its oral and written rulings, and because it is clearly supported by the record, we choose to exercise our discretion and proceed to consider the merits of the alimony award."). As a result, if the trial court did not err in finding section 36-6-406 dispositive of the children's residential schedule, the trial court did not err in declining to address the section 36-6-106 best interest factors.

As previously discussed, the trial court's order does not plainly list the specific subsection of section 36-6-406 that it relied upon in creating the parties' parenting schedule. In reaching its determination, however, the trial court expressly relied upon this Court's Opinions in *Duke v. Duke*, No. M2013-00624-COA-R3-CV, 2014 WL 4966902 (Tenn. Ct. App. Oct. 3, 2014), and *Thomas v. Thomas*, No. M2011-00906-COA-R3-CV, 2013 WL 1225849 (Tenn. Ct. App. Mar. 26, 2013). In both cases, we affirmed each trial court's decision to limit a parent's visitation under the discretionary limitations contained in subsection (d). *See Duke*, 2014 WL 4966902 at *14; *Thomas*, 2013 WL 1225849, at *4. As such, we conclude that the basis of the trial court's ruling also rests in subsection (d). From our review of the record, the trial court could similarly have relied upon the limitation requirement in section 36-6-406(a) to prohibit Husband from interacting with the children. *See White v. Dozier*, No. M1999-02386-COA-R3-CV, 2000 WL 244229, at *2 (Tenn. Ct. App. Mar. 6, 2000) (noting that appellate courts "may examine the record and affirm the [trial] court on other grounds if we determine that there exists no material controversy regarding matters of fact or law." (quoting *Hooks v. Hooks*, 771 F.2d 935, 945 (6th Cir. 1985))); *Bobo v. City of Jackson*, 511 S.W.3d 14, 21–22 (Tenn. Ct. App. 2015); *Hill v. Lamberth*, 73 S.W.3d 131, 136 (Tenn. Ct. App. 2001). As such, we will consider each of these subsections.

Section 36-6-406(a) provides that

[A] parent's residential time as provided in the permanent parenting plan . . . *shall be limited* if the limitation is found to be in the best interest of the minor child and if the court determines, based upon a prior order or other reliable evidence, that a parent has engaged in any of the following conduct:

(1) Willful abandonment that continues for an extended period of time or

---

[26] Importantly, Husband does not assert on appeal that the trial court erred in considering section 36-6-406. He simply confines his arguments to section 36-6-106. Clearly, however, the trial court's ruling implicates section 36-6-406. *See Morgan Keegan & Co.*, 401 S.W.3d 595, 608 (Tenn. 2013) ("[W]hen construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated." (citations omitted)); *see also Shofner v. Shofner*, 181 S.W.3d 703, 716 (Tenn. Ct. App. 2004) (noting that trial courts must "base their decisions on the evidence presented to them and upon the proper application of the relevant principles of law").

substantial refusal to perform parenting responsibilities; or

(2) Physical or sexual abuse or a pattern of emotional abuse of the parent, child or of another person living with that child as defined in § 36-3-601.

Tenn. Code Ann. § 36-6-406(a) (emphasis added). This Court has previously interpreted subsection (a) as mandatory. *Carr v. Carr*, No. M2017-00556-COA-R3-CV, 2018 WL 1137109, at *6 (Tenn. Ct. App., Mar. 1, 2018) ("section 36-6-406(a)(2) embodies a statutory mandate"); *Jacobsen v. Jacobsen*, No. M2012-01845-COA-R3-CV, 2013 WL 1400618, at *1, *6 (Tenn. Ct. App., Apr. 5, 2013) (section 406(a) "mandates that a parent's parenting time shall be limited if the parent is found to have engaged in abuse"); *In re Emma E.*, No. M2008-02212-COA-R3-JV, 2010 WL 565630, at *7 (Tenn. Ct. App., Feb. 17, 2010) (stating that, pursuant to the statute, "[i]f the court determined that Father physically, sexually, or emotionally abused Mother, it would have been bound to limit Father's parenting time to some degree"); *Beyer v. Beyer*, 428 S.W.3d 59, 71 (Tenn. Ct. App. 2013); *Burden v. Burden*, 250 S.W.3d 899, 913 (Tenn. Ct. App. 2007). So too has the Tennessee Supreme Court concluded that a finding of abuse under section 406(a) "necessitates limiting the parent's residential time with the child." *Armbrister*, 414 S.W.3d at 696.

Here, Husband's continuous stalking and harassment of Wife, despite repeated court orders and arrests, clearly constitutes "a pattern of emotional abuse" sufficient to establish that limiting his parenting time is in the best interests of the parties' children. Although "parenting plans should never be used to punish or reward the parents for their human frailties or past mis-steps, . . . they should be used to advance the children's best interests by placing them in an environment that best serves their physical and emotional needs." *Shofner*, 181 S.W.3d at 716 (citations omitted).[27] Here, we find it difficult to classify Husband's actions, as he does, as merely *past* mis-steps when he exhibits very little sincere remorse for his words and actions toward Wife or the effect his behavior has had on either his relationship with the children or the children themselves. *See In re Brandon H.*, No. E2020-00713-COA-R3-PT, 2021 WL 321383, at *7 (Tenn. Ct. App. Feb. 1, 2021) (noting, in the parental rights termination context, that the father's "refusal to acknowledge his actions and the effect of those actions on the [c]hild demonstrates: (1) [the f]ather's disregard for the [c]hild's safety and wellbeing; and (2) [the f]ather's unwillingness to change his harmful behaviors"). Rather, the evidence presented paints a disturbing portrait of a father who apparently felt no compunction against stalking and harassing his former

---

[27] It is also difficult to contemplate the permanent parenting plan as a punishment for, rather than merely a consequence of, Husband's behavior, when the trial court provided Husband with a straightforward and not unduly burdensome method of re-establishing contact with the children. In leaving open the possibility of rehabilitation and future visitation, the trial court clearly agreed that "[n]ot all parental misconduct is irredeemable." *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Regardless, the trial court was clear in its assessment that prohibiting contact with Husband served the children's best interests and protected the children's physical safety.

wife, threatening Wife, her boyfriend, and even Wife's counsel's children, despite multiple orders from courts that he should refrain from this conduct. And even when Husband's actions caused the children to desire a cessation of their relationship with him, he persisted in his wholly inappropriate and arguably criminal conduct. *But see* **Burchfield v. Burchfield**, No. M2017-01326-COA-R3-CV, 2019 WL 2185513, at \*13 (Tenn. Ct. App. May 21, 2019) (noting that under section 406(a)(2), "the trial court's duty to limit or restrict the abusing parent's residential parenting time is mandatory and is not limited to situations where the parent's abuse adversely affected the children"). It is clear that Husband did not desire the divorce. But as the trial court cautioned, much of his conduct only worsened his situation, rather than working toward a reconciliation with Wife. The evidence therefore clearly established that Husband engaged in a pattern of emotional abuse against Wife throughout the pendency of this matter. Thus, the trial court did not err in limiting Husband's parenting time pursuant to section 36-6-406(a).

We also cannot conclude that the trial court abused its discretion in limiting Husband's parenting time under subsection (d). Tennessee Code Annotated section 36-6-406(d) provides, in relevant part, as follows:

A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:

(1) A parent's neglect or substantial nonperformance of parenting responsibilities;

(2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;

\* \* \*

(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development; . . . .

\* \* \*

(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

Here, there was no dispute that Husband failed to provide child support as ordered by the trial court resulting in a significant arrearage despite his ability to pay. *See* Tenn. Code Ann. § 36-6-406(d)(1); *see also* Tenn. Code Ann. § 36-6-402(2) (including the provision of "financial security and support of the child in addition to child support

- 18 -

obligations" in the definition of "parenting responsibilities"). Additionally, Wife explained that even before the trial court prohibited Husband from coming around the children, Husband's conduct led the children to stop wanting to visit with him, "because they didn't like seeing their daddy act the way he was acting." Then, after visitation restarted in July 2022, the children again expressed their desire to not call or visit with Husband. That this non-contact was the children's choice certainly implicates the lack of a positive relationship between Husband and the children. *See* Tenn. Code Ann. § 36-6-406(d)(4). There is no question that Husband engaged in the abusive use of conflict against Wife. While we believe it is likely that psychological harm could result in light of Husband's actions, we note that little evidence was presented of this fact for these particular children. Tenn. Code Ann. § 36-6-406(d)(5). Finally, the trial court was also clear that it found Husband's threats toward the children of Wife's boyfriend and Wife's attorney to be indicative of potential harm to the safety of the parties' children. So too would Husband's behavior and "volatile personality" render supervised visitation unsafe. *See* Tenn. Code Ann. § 36-6-406(d)(8); ***Duke***, 2014 WL 4966902, at *22 ("[D]efinite evidence that visitation places a child in physical or moral jeopardy may justify limiting, or even eliminating, a noncustodial parent's visitation." (citing ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001))). With multiple section 36-6-406(d) factors existing, the trial court's decision to limit Husband's parenting time does not "fall[] outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." ***Armbrister***, 414 S.W.3d at 693.

Thus, the trial court was justified under either subsection (a)'s mandatory limiting factors or subsection (d)'s discretionary limiting factors to restrict Husband's visitation without consideration of the section 36-6-106 best interest factors. *See* ***Armbrister***, 414 S.W.3d at 696; ***Deaton v. Williams***, No. W2018-00564-COA-R3-JV, 2020 WL 864990, at *2 (Tenn. Ct. App. Feb. 21, 2020) ("Unless otherwise prohibited by Tennessee Code Annotated section 36-6-406, in setting the residential schedule, the trial court is directed to conduct a best interest analysis based upon the factors found in section 36-6-106(a)(1)–(15)."); ***Lindsley v. Lindsley***, No. M2019-00767-COA-R3-CV, 2020 WL 7029361, at *4 n.2 (Tenn. Ct. App. Nov. 30, 2020) ("When fashioning a parenting plan, trial courts are required to consider the factors in Tennessee Code Annotated section 36-6-106(a)(1)–(15) if the limitations of section 36-6-406 are not dispositive of the child's residential schedule."). The trial court therefore did not err by failing to consider those additional factors.

In sum, we conclude that the trial court's decision was not unsupported by the evidence, based on an error of law, or against the children's best interests. *See* ***Shofner***, 181 S.W.3d at 716 (noting that a trial court's broad discretion in forming parenting plans may be questioned if it concludes "that the trial court's decision is not supported by the evidence, that the trial court's decision rests on an error of law, or that the child's interests will be best served by another parenting arrangement." (citing ***Eldridge***, 42 S.W.3d at 85)). The trial court did not abuse its discretion in limiting Husband's contact with the children

until he submits to a full psychiatric evaluation and follows all recommendations. We therefore affirm the permanent parenting plan entered by the trial court.

## B. Lifetime Restraining Order

Husband's second issue involves the trial court awarding Wife a lifetime restraining order against him. In arguing that the trial court erred in doing so, Husband presents three arguments: (1) that Wife did not ask for a lifetime restraining order; (2) that Wife admitting to tempting Husband into violating previous restraining orders left her with unclean hands; and (3) that Tennessee Code Annotated section 36-6-327 provides only for lifetime orders of protection and the statutory requirements therefor were not met here.

We first note that Husband's argument regarding the statutory provision for lifetime orders of protection is misplaced. While orders of protection and restraining orders are both prohibitions on certain conduct that may be issued in domestic relations cases, they are distinct remedies. *See Elmore v. Cruz*, No. E2001-03136-COA-R3-CV, 2003 WL 239169, at *3 (Tenn. Ct. App. Feb. 4, 2003) ("It is undisputed that different procedures are required for enforcing an order of protection than for enforcing a mutual restraining order."); *Wiser v. Wiser*, No. M2010-02222-COA-R3-CV, 2011 WL 4729870, at *1 (Tenn. Ct. App. Oct. 7, 2011) ("Orders of Protection provide greater protection for victims of domestic abuse than would a basic restraining order, even though both can prohibit the abusive behavior."). The two are not mutually exclusive, and Wife was awarded both restraining orders and an order of protection during the course of this matter. *Wiser*, 2011 WL 4729870, at *4 ("The legislature recognized and intended that Orders of Protection can co-exist with other injunctive relief granted pursuant to a divorce."). Regardless, here the trial court clearly awarded a restraining order in its final judgment. Thus, Husband's argument that the requirements for a lifetime order of protection were not proven in this case lacks merit.

As to the merits of the restraining order itself, our standard of review is for an abuse of discretion. *See Highlands Physicians, Inc. v. Wellmont Health Sys.*, 625 S.W.3d 262, 310 (Tenn. Ct. App. 2020) (noting that a "trial court's decision regarding whether to grant injunctive relief is reviewed under an abuse of discretion standard." (citation omitted)). "Trial courts enjoy 'wide discretion' when issuing restraining orders in domestic relations cases." *Duke v. Duke*, No. M2013-00624-COA-R3-CV, 2014 WL 4966902, at *28 (Tenn. Ct. App. Oct. 3, 2014) (quoting *Price v. Price*, No. E1999-00102-COA-R10-CV, 2000 WL 704596, at *8 (Tenn. Ct. App. May 31, 2000)). Indeed, Rule 65.07 of the Tennessee Rules of Civil Procedure provides that:

> In domestic relations cases, restraining orders or injunctions may be issued upon such terms and conditions and remain in force for such time as shall seem just and proper to the judge to whom application therefor is made, and the provisions of this Rule shall be followed only insofar as deemed appropriate by such judge.

Tenn. R. Civ. P. 65.07.[28]

However, this discretion is not unlimited. Rule 65.02 prescribes that "*[e]very* restraining order . . . *shall* be specific in terms and shall describe in reasonable detail, and not by reference to the complaint or other document, the act restrained or enjoined." Tenn. R. Civ. P. 65.02(1) (emphasis added). And the Advisory Commission's comment to the Rule explains that, "in the handling of domestic relations cases, *some departure* from the handling suggested by these rules might be necessary[.]" Tenn. R. Civ. P. 65.02, advisory commission comment (emphasis added). Taking into consideration this limiting language, "[t]he domestic relations exception in [Rule] 65.07 does not excuse a trial court from compliance with the specificity requirements of [Rule] 65.02(1) to describe the prohibited acts in reasonable detail." **Hogue v. Hogue**, 147 S.W.3d 245, 252 (Tenn. Ct. App. 2004); *see also* **Knellinger v. Knellinger**, No. M2012-02343-COA-R3-CV, 2013 WL 4714432, at *9 (Tenn. Ct. App. Aug. 29, 2013) (noting that "Mother's request to enjoin Step-mother from 'any other disruptive activities,' does not meet the requirements of Tennessee Rule of Civil Procedure 65.02(1), because it 'does not 'describe in reasonable detail, . . . the act restrained or enjoined[,]'" and affirming the denial of a permanent restraining order (citation omitted)). Thus, although trial courts have discretion regarding the terms, conditions, and duration of a restraining order in a domestic relations case, the resulting order must still, on its face, be specific and include reasonable detail.

Here, the trial court simply states that "Wife shall be awarded a lifetime Restraining Order against Husband." Although this order does not contain an explicit description of the enjoined behavior, "when construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated." **Morgan Keegan & Co.**, 401 S.W.3d at 608 (citations omitted). A reasonable implication of the trial court's directive is that the restraining order issued immediately prior to the lifetime order was simply being made permanent. *See, e.g.*, **Hines v. Hines**, No. M2014-01836-COA-R3-CV, 2015 WL 7424903, at *2 (Tenn. Ct. App. Nov. 20, 2015) (noting that the trial court "made permanent [the w]ife's restraining order against [the h]usband"); **In re Caleb L.C.**, 362 S.W.3d 581, 583 (Tenn. Ct. App. 2011) (noting that the trial court's "divorce decree specifically made permanent the restraining order prohibiting [the f]ather from contacting [the m]other or [the child]").

But in its January 2022 order, the most recent order dealing with prohibitions on

---

[28] Husband asserts that Wife "did not even ask" for relief in the form of a lifetime restraining order. However, Wife has repeatedly requested a restraining order against Husband, including in her complaint and at trial. The discretion as to duration granted by Rule 65.07 supports the trial court's decision to make the requested restraining order permanent. **Tippens-Florea v. Florea**, No. M2011-00408-COA-R3-CV, 2012 WL 1965593 (Tenn. Ct. App. May 31, 2012) (noting that the wife was granted a divorce based on the husband's inappropriate marital conduct, "as well as a permanent restraining order" against the husband, with neither aspect of the judgment appealed).

- 21 -

Husband's conduct, the trial court merely directed that its prior restraining order and order of protection would "remain in full force and effect with the exception of court appearance ONLY. [Husband] shall not enter Henry County, Tennessee for any other reason as ordered by this Court and reiterated to him this date." Thus, this earlier order also fails to "be specific in terms" or provide "reasonable detail," other than "by reference to the complaint or other document[.]" Tenn. R. Civ. P. 65.02(1).

We therefore vacate the trial court's award of the "lifetime Restraining Order" and remand this matter for the trial court to enter a new restraining order that more substantially complies with the specificity requirement of Tennessee Rule of Civil Procedure 65.02. In recognition of Husband's argument regarding Wife's prior attempts to reconcile that led to violations of previous restraining orders,[29] we suggest that this new order include a method by which its terms can be revisited should there be a change in the parties' circumstances. *See In re Maddox C.*, No. M2016-01129-COA-R3-PT, 2016 WL 6649249, at *1 (Tenn. Ct. App. Nov. 9, 2016) (noting that the juvenile court "ordered that the restraining order would 'become permanent until further order of the court'"). While this matter returns to the trial court, the September 7, 2021 restraining order shall remain in effect, such that Husband remains "restrained and prohibited from interfering with [Wife's] care, custody, and control of the parties' minor children . . . or coming around or about [Wife] or the children in any form or fashion."

### C. Wife's Appellate Attorney's Fees

Finally, we address Wife's request to be awarded her attorney's fees on appeal. Wife argues that she is entitled to her appellate attorney's fees pursuant to Tennessee Code Annotated section 27-1-122, which provides that:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122. "An appeal is frivolous when it 'has no reasonable chance of success' or is 'so utterly devoid of merit as to justify the imposition of a penalty.'" *Stokes v. Stokes*, No. M2018-00174-COA-R3-CV, 2019 WL 1077263, at *10 (Tenn. Ct. App. Mar. 7, 2019) (quoting *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009)).

---

[29] Husband provided no legal citation regarding the effect of unclean hands on the trial court's discretion in forming restraining orders. *See Bean v. Bean*, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000) ("Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue."). However, Wife admitted that the parties did not follow the terms of the restraining orders at points where the circumstances between them had changed.

An award of appellate attorney's fees is within this Court's sole discretion, though the statute is meant to be applied sparingly "to avoid discouraging legitimate appeals." *Id.* (citing **Chiozza**, 315 S.W.3d at 493). Although we have not ruled substantively in Husband's favor in this appeal, we do not deem his appeal frivolous. As such, we decline to award attorney's fees under section 27-1-112 in this case.[30]

## V. CONCLUSION

The judgment of the Henry County Chancery Court is therefore affirmed in part and vacated in part, and this matter is remanded to the trial court for further proceedings as consistent with this Opinion. Costs of this appeal are taxed one-half to Appellant Bradley Cooper, and one-half to Appellee Jamie M. Cooper, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

---

[30] Wife did not request her attorney's fees under Tennessee Code Annotated section 36-5-103(c), which permits the award of reasonable attorney's fees in any "proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing."